# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

JAVIER GOMEZ,
JOSE M. MELGAR
JOSE G. MELGAR

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

**MAGISTRATE JUDGE COLE**

FILED
JUL 1 0 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER: **08 CR 544**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __July 9, 2008__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

knowingly conspire with persons known and uknown to attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of 21 United States Code, Section 841,

in violation of Title __21__ United States Code, Section(s) __846__.

I further state that I am a(n) __Special Agent, Drug Enforcement Agency__ and that this complaint is based on the following
                                    Official Title

facts:

Continued on the attached sheet and made a part hereof:  __X__ Yes  ____ No

_signature_
Signature of Complainant

Sworn to before me and subscribed in my presence,

__July 10, 2008__                             at __Chicago, Illinois__
Date                                              City and State

Hon. Jeffrey Cole, U.S. Magistrate Judge            _signature_
Name and Title of Judicial Officer                  Signature of Judicial Officer

## **AFFIDAVIT**

I, Philip McCormick, being duly sworn, depose and state:

1. I have been a Special Agent ("SA") with the Drug Enforcement Administration since February 2004. In connection with my official duties, I have received specialized training in and have investigated numerous federal narcotics violations. Specifically, I have training and experience in drug identification, surveillance, Title III investigations, undercover operations, controlled deliveries, and reverse operations. Prior to becoming an SA with DEA, I was assigned to the Counter terrorism section of the Indiana State Police as the Deputy Director.

2. I am familiar with the facts and information contained in this affidavit from my own personal observations, witness interviews, surveillance, review of video surveillance, analysis and review of documents and records, and discussions with other law enforcement agents and officers involved in this investigation. Because this affidavit is submitted solely for the purpose of establishing probable cause in support of a criminal complaint, the information contained herein is described in summary form and is not every fact known to me regarding this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part, and are not verbatim. Statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversation, and are not taken from a final transcript.

3. I have been conducting an investigation regarding alleged violations of the federal narcotics trafficking laws, specifically 21 U.S.C. §846. As described below, this investigation resulted in one reverse operation. Based on the information contained in this affidavit, I submit that there is probable cause to believe that on or about July 9, 2008, Jose J. GOMEZ, Jose M. MELGAR, and Jose G. MELGAR, conspired with each other and with others unknown to knowingly and

1

intentionally possess with intent to distribute controlled substances, namely 5 kilograms or more of mixtures containing cocaine, in violation of 21 U.S.C. §846.

**Phone Conversations Planning the Transaction**

4. On or about July 4, 2008, or July 5, 2008, DEA received information from a cooperating defendant ("CD")[1] that GOMEZ was interested in purchasing five kilograms of cocaine. According the CD, he spoke to GOMEZ on the telephone and told him that the sale would have to wait until the following week. This call was not recorded.

5. According to the CD, on or about July 8, 2008, he received another telephone call from GOMEZ. According to the CD, GOMEZ asked to meet, and the CD told him they could meet tomorrow. This call was not recorded.

6. According to the CD, on or about July 9, 2008, the CD placed a recorded call to GOMEZ. In that conversation, GOMEZ said that the money was ready and asked if the CD could bring a "photo," which in my training and experience is consistent with being a code word for a sample of narcotics. CD said no, that's why they needed to meet. GOMEZ and the CD agreed to meet at the Dunkin Donuts near the intersection of Archer Avenue and Harlem Avenue, in Summit, Illinois, at 1 p.m. that day. GOMEZ said that he would be driving a gray Blazer.

---

[1] The CD has been indicted with conspiracy to knowingly and intentionally to possess with intent to distribute and to distribute cocaine, in violation of Title 21, United States Code, Section 846. The CD is cooperating in the hope of receiving a reduced sentence on this charge. The CD also has prior convictions for narcotic possession, firearm possession, conviction, and criminal damage to property.

## July 9, 2008 Meeting At the Dunkin' Donuts

7. Surveillance agents ("surveillance") saw the CD enter the Dunkin Donuts at approximately 1:10 p.m. on July 9, 2008.[2] Surveillance saw a gray Trailblazer enter the Dunkin Donuts parking lot at approximately 1:30 p.m. Surveillance saw the driver, later identified as Javier GOMEZ, enter the Dunkin Donuts. Surveillance saw GOMEZ and the CD meet for approximately ten minutes.

8. According to the CD, who was debriefed shortly after this meeting, GOMEZ told the CD that he wanted to get five, which the CD understood to mean five kilograms of cocaine. GOMEZ asked how much they were going for, and the CD responded that it would be "23 per," by which he meant $23,000 per kilogram of cocaine. GOMEZ asked if he could get six for a hundred, which the CD understood to mean six kilograms for $100,000. The CD said no, and repeated his initial price of "23 per." GOMEZ replied, okay, so that's one hundred fifteen, which the CD understood to mean $115,000 for the five kilograms, and said he would have the money in about an hour. The CD told GOMEZ that the CD would need to first see the money before exchanging any drugs. Surveillance saw GOMEZ and the CD leave the Dunkin Donuts shortly before 2 p.m.

9. During the meeting, law enforcement agents queried the Illinois Secretary of State database and determined that a Javier GOMEZ was the registered owner of the gray Trailblazer. DEA also obtained a criminal history photograph of Javier GOMEZ from other criminal database checks. After the meet, the CD was shown this photograph. The CD confirmed that the person in the photograph was the same person with whom he had just met at the Dunkin Donuts. Based on

---

[2]This meeting was also videotaped. The visuals of this meet has been reviewed, but a Spanish speaking agent has not yet reviewed the audio portion of this tape.

3

my review of the videotape of the meeting, the person who met with the CD at the Dunkin Donuts is the same person depicted in the photograph.

**Additional Planning Calls on July 9, 2008**

10. According to the CD, approximately ten minutes after the meeting, GOMEZ called him and said that he had the money and asked where to meet. The CD said he would call him back. This call was unrecorded.

11. At approximately 3:24 p.m., the CD placed a recorded call to GOMEZ. Based on review of the recorded call and debriefing of the CD, the CD told GOMEZ that he would pick up his friend and then determine when and where they would meet. GOMEZ said that he would be with his cousin and his cousin's brother-in-law.

12. At approximately 4:10 p.m., the CD placed a recorded call to GOMEZ. Based on review of the call and debriefing of the CD, the CD asked to meet in the vicinity of 79th and Harlem. GOMEZ agreed to meet them there in half an hour. GOMEZ said he didn't want to ride with the "papers," which in my training and experience is a code word used when referring to money.

13. At approximately 5:00 p.m., the CD received an unrecorded call from GOMEZ, saying that GOMEZ was in the area. The CD said he would meet him at the K-Mart parking lot at that intersection shortly.

**July 9, 2008 Transaction at the K-Mart Parking Lot**

14. According to the UC and surveillance, the UC arrived and waited for GOMEZ at the

According to the UC and surveillance, as the UC walked towards to the Navigator, the GMC returned to the K-Mart parking lot. According to the UC, the UC walked over to the front passenger window of the GMC and shook hands with Jose M. MELGAR. According to the UC and surveillance, Jose M. MELGAR leaned left towards the rear seat and brought out a brown bag with blue lining and opened it and showed it to the UC. According to the UC, the UC saw rubber-banded bundles of cash. According to the UC, the UC asked Jose M. MELGAR about the denominations in the bag, and Jose M. MELGAR replied that there were mostly 20's and 50's. According to the UC, the UC saw Jose G. MELGAR looking in the direction of the bag, as this was going on. According to the UC, the UC told Jose M. MELGAR that the UC was going to get in his car and that they should follow him.

20. According to the UC, the UC also told GOMEZ to follow him.

21. According to the UC and surveillance, the UC walked away from the GMC and approached the passenger of the Navigator and shook his hand. According to the UC, the passenger unscrewed a canister and showed the interior of the canister to the UC. According to the UC, the UC saw cash wrapped inside the cannister. According to the UC told the passenger of the Navigator to follow him.

22. According to the UC and surveillance, the UC and the CD got into the CD's car, with the UC driving. The UC contacted other DEA agents and informed them that the bulk of the U.S. currency was inside the GMC. The UC drove south on Oketo, followed by the GMC and Navigator, and stopped at a stop sign.

23. Shortly after, Bridgeview police officers stopped the GMC for improperly displaying a license plate and speeding in a residential zone. The patrol units ask to search the car, and the driver,

6

JOSE G. MELGAR consented. The police officers asked JOSE G. MELGAR, JOSE M. MELGAR, and GOMEZ to exit the car for officer safety and to facilitate the search.

24. A K-9 unit did a search of the GMC. The K-9 unit gave a positive indication on the brown bag for the presence of narcotics. The patrol officer opened the brown bag and saw that it contained a large amount of U.S. currency.

25. The patrol officer asked JOSE G. MELGAR, JOSE M. MELGAR, and GOMEZ about the bag of money. All three responded that they did not know that there was money inside the car.

26. At that point, JOSE G. MELGAR, JOSE M. MEGLAR and GOMEZ were taken into custody. At the Bridgeview Police Department they were further questioned. Again, all three said that they did not know that there was any money inside the car.

27. Based on my review, the money that was recovered from the GMC was contained in a dark brown bag with light blue lining. Agents have not yet had the opportunity to count the money recovered from the GMC. It appears to consist of several bundles, held together by rubber bands, containing different denominations of U.S. currency. Based on my experience and training, rubber-banded bundles of U.S. currency in different denominations are consistent with money used for narcotics purchases.

28. Based on the foregoing, I believe there exists probable cause to believe that GOMEZ, JOSE M. MELGAR, and JOSE G. MELGAR, conspired with each other and with others unknown knowingly and intentionally possess with intent to distribute controlled substances, namely 5 kilograms or more of mixtures containing cocaine, in violation of 21 U.S.C. §846.

Further affiant sayeth not.

Philip McCormick
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me
this __ day of July, 2008

Hon. Jeffrey Cole
United States Magistrate Judge